1  Joshua H. Reisman, Esq.
   Nevada Bar No. 7152
2  Robert R. Warns III, Esq.
   Nevada Bar No. 12123
3  REISMAN SOROKAC
   8965 South Eastern Avenue, Suite 382
4  Las Vegas, NV 89123
   Telephone: (702) 727-6258
5  Facsimile: (702) 446-6756
   E-mail: jreisman@rsnvlaw.com
6  E-mail: rwarns@rsnvlaw.com

7  Attorneys for Plaintiff

8

9

10              UNITED STATES DISTRICT COURT

11                   DISTRICT OF NEVADA

12  BOILERMAKERS LODGE NO. 154          )  Case No. 2:12-cv-00555
    RETIREMENT FUND, Derivatively on Behalf )
13  of WYNN RESORTS, LIMITED,           )
                                        )
14              Plaintiff,              )  **VERIFIED SHAREHOLDER**
                                        )  **DERIVATIVE COMPLAINT FOR**
15         v.                           )  **BREACH OF FIDUCIARY DUTIES,**
                                        )  **WASTE OF CORPORATE ASSETS,**
16  STEPHEN A. WYNN, ELAINE P. WYNN,    )  **AND UNJUST ENRICHMENT**
    MARC D. SCHORR, LINDA CHEN, ALLAN   )
17  ZEMAN, ALVIN V. SHOEMAKER, D.       )  **JURY DEMAND**
    BOONE WAYSON, RUSSELL GOLDSMITH,    )
18  ROBERT J. MILLER, JOHN A. MORAN, and )
    RAY R. IRANI,                       )
19                                      )
                Defendants,             )
20                                      )
                                        )
21        -and-                         )
                                        )
22  WYNN RESORTS, LIMITED, a Nevada     )
    corporation,                        )
23                                      )
                Nominal Defendant.      )
24  _____)

25  / / /

26  / / /

27  / / /

28

**JURISDICTION AND VENUE**

1.     Jurisdiction is conferred by 28 U.S.C. §1332.  Complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interest and costs. This Court also has jurisdiction under Article III of the United States Constitution and 28 U.S.C. §1331 because the underlying wrongdoing results from violations of the Foreign Corrupt Practices Act ("FCPA") and United States Code § 78dd-l.  This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

2.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

3.     Venue is proper in this Court in accordance with 28 U.S.C. §1391(a) because: (i) Wynn Resorts, Limited maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Wynn Resorts, Limited, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

/ / /

**NATURE OF THE ACTION**

4.    This is a verified shareholder derivative action brought by plaintiff on behalf of nominal defendant Wynn Resorts, Limited ("Wynn" or the "Company") against certain of its officers and directors for breaches of fiduciary duties and violations of law.  These wrongs resulted in tens of millions of dollars in damages to Wynn's reputation, goodwill, and standing in the business community.  Moreover, these actions have exposed the Company to tens of millions of dollars in potential liability for violations of state and federal law.

5.    Macau is a special administrative region of the People's Republic of China ("China").  The territory's economy is heavily dependent on gambling and tourism.  In May 2011, Wynn Macau, Limited ("Wynn Macau") a wholly-owned Wynn subsidiary, pledged to "donate" HK$1 billion (about US$135 million) to the University of Macau Development Foundation.  The University of Macau donation consisted of a $25 million contribution made in May 2011, and a commitment for additional donations of $10 million each year for the calendar years 2012 through 2022, for a total of $135 million.  All but one member of the Board of Directors (the "Board") approved this contribution.  Whether the result of a conscious decision by the Board or the complete dereliction of its duties to protect Wynn's interests, this transfer of tens of millions of dollars is a waste of corporate assets and exposed the Company to violations of the FCPA.

6.    The FCPA makes it unlawful for covered companies such as Wynn to make improper payments to foreign officials to obtain or retain business.  To prevent such bribes and kickbacks from occurring, the FCPA requires that covered companies establish and maintain a system of accounting controls to ferret out and ultimately prevent such illicit payments.  Non-compliance with the FCPA may result in fines, sanctions, and other adverse actions, including exposing the Company to civil liability.  The contribution to the University of Macau

Development Foundation is an attempted end-around the FCPA and constituted an egregious and shocking breach of the Board's fiduciary duties. The Board either knew it was embarking on an improper payment to a foreign university run by a foreign government in exchange for favorable treatment for land concession agreements (i.e., leases) from the government and inexplicably assented to this, or was so utterly uninformed and detached from critical fiduciary duties that it is required to fulfill. The Board utterly failed to act to prevent this enormous wealth transfer and unconscionable waste of corporate assets that causes the Company to now face serious damages, including fines, penalties, loss of its gaming licenses, and adverse changes to its business practices and compliance programs.

7.   Wynn opened its first hotel in Macau in 2006 on a piece of land with a land concession agreement that ran from 2002 through 2022. Wynn, however, sought to further expand in Macua. In February 2006, the Company announced that it had submitted an application to the Macau government for a second land concession agreement for another fifty-four acres to build a new casino resort on the Cotai Strip, the casino and tourism district of Macau. With Macau the future of the Company's organic growth, the approval of the application was vitally important to Wynn as a rejection of the application would have a negative impact on the Company's future financial revenue. In order to help push the land concession agreement along, in May 2011, fifteen of sixteen of the Company's then directors approved the $135 million "donation" to the University of Macau. The land concession agreement was approved and issued by the Macau government on July 21, 2011, a mere two months after the Company announced its donation to the University of Macau Development Foundation. The donation represents approximately 70% of the University of Macau's overall endowment. Notably, the Chancellor of

the University of Macau is also the head of the Macau special administrative region's government, with ultimate oversight of gaming matters.

8.     Kazuo Okada ("Okada"), a co-founder and director of Wynn, former personal friend of defendant Stephen A. Wynn ("S. Wynn"), and partner in his business ventures, is the only director that voted against the payment to the University of Macau.  Okada noted that the University of Macau sits on land owned by the government, and there was no discussion among the Board regarding whether such a large gift, over such a long period, is an appropriate use of corporate funds.  In a Petition for a Writ of Mandamus ("Petition") to inspect Wynn's books and records to determine if any of Okada's business associations' investments in Wynn went into the payment to the University of Macau, Okada makes clear he objected to and voted against the donation, "which appears to be unprecedented in the annals of the University of Macau, and in the history of Wynn Resorts."  Okada specifically objected to "the unprecedented size and duration of the commitment ... [and] how the University of Macau would use the funds."  More importantly, Okada "was concerned about the lack of deliberation of the boards of Wynn [ ] and Wynn Macau (the donation was approved at a joint meeting in Macau of the two boards), and that pending approvals in Macau related to a new development in Cotai, and the coincidence of the date of the donation and the term of Wynn Macau's gaming license in Macau, might make it appear that Wynn Macau and Wynn [ ] were paying for benefits."

9.     In response to the Petition, defendant S. Wynn and the rest of the Board embarked on a plan to discredit Okada and make counter-accusations to deal with his very serious allegations against the Board.  The Company sued Okada, Aruze USA, Inc. ("Aruze") and Universal Entertainment Corp. ("Universal") for breach of fiduciary duty.  Conversely, Okada filed a counterclaim accusing Wynn's Board of improprieties and has alleged that the Board

breached its fiduciary duties to the Company.  Okada alleges that in addition to the improper donation to the University of Macau, the Board also acted in a manner contrary to the best interests of Wynn by having the Company engage in a reckless, improper internal investigation of Okada that was designed to:  (i) force Okada out of his role as Vice Chairman and director; and (ii) allow for the forcible redemption of his common shares in Wynn held individually through Aruze at a 30% discount to its then current market value.  According to Okada, S. Wynn controlled the Board and engaged in this behavior to allow S. Wynn to retain unfettered control of Wynn and its Board, which following S. Wynn's divorce from his wife, defendant Elaine P. Wynn ("E. Wynn"), was at risk.

10.     As part of its plan to discredit Okada, the Board hired counsel to conduct an investigation of Okada.  Okada claims that this purportedly independent investigation conducted by Freeh Sporkin & Sullivan, LLP ("Freeh Sporkin") was a sham.  Freeh Sporkin issued a report (the "Freeh Report") that purportedly determined Okada was unsuitable to own shares in Wynn, and the Board used that as a basis to "redeem" Okada's $2.77 billion stake in Wynn in exchange for a promissory note that will pay Okada only $1.9 billion in ten years at a 2% annual interest rate.  The unilateral buyout of Okada's interest is financially advantageous for defendant S. Wynn because his stake in the Company will increase as a result of the fewer shares outstanding and disposal of the Company's largest shareholder.  The redemption, however, is of questionable legality, and will result in the Company needing to spend significant costs in defending the action.  Okada claims he was never given a fair opportunity to defend himself from the Freeh Report or the redemption of his shares.

11.     These actions have resulted in significant costs to the Company, including an informal inquiry by the U.S. Securities and Exchange Commission ("SEC") and potential U.S.

Department of Justice ("DOJ") investigations.  As Professor Peter Henning who writes the White Collar Crime Watch for the *New York Times* stated, defendant S. Wynn's accusations against Okada "open up a can of worms" and that "the [DOJ] and the [SEC] will be scouring the [C]ompany's books for possible violations, a front that neither side can control" and that "by invoking the specter of overseas bribery, Wynn has effectively opened itself up to a wide-ranging federal investigation of its dealings in Macao and elsewhere."

### THE PARTIES

**Plaintiff**

12.     Plaintiff Boilermakers Lodge No. 154 Retirement Fund was a shareholder of Wynn at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current Wynn shareholder.  Plaintiff is a citizen of Pennsylvania.

**Nominal Defendant**

13.     Nominal Defendant Wynn is a Nevada corporation with principal executive offices located at 3131 Las Vegas Boulevard South, Las Vegas, Nevada.  Wynn, formed in June 2002, is a leading developer, owner, and operator of destination casino resorts.  Wynn owns and operates two destinations resorts: "Wynn Las Vegas," which includes "Encore at Wynn Las Vegas," and "Wynn Macau," which includes "Encore at Wynn Macau."  Wynn is the parent company of Wynn Macau which in turn owns Wynn Resorts (Macau) S.A. ("WRM"), the owner and operator of the Wynn Macau.  Wynn is named in this Complaint as a nominal defendant solely in a derivative capacity, and this shareholder derivative action is on its behalf.

**Defendants**

14.     Defendant S. Wynn is Wynn's Chairman of the Board and Chief Executive Officer ("CEO") and has been since June 2002.  S. Wynn is also Chairman of the Board, a director, CEO, and President of Wynn Macau and has been since September 2009, as well as WRM's Chairman of the Board, a director, and CEO and has been since October 2001.  S. Wynn

approved the transfer of the HK$1 billion (about US$135 million) to the University of Macau.  S. Wynn knew, or was reckless in not knowing, that the transfer to the University of Macau Development Foundation would expose the Company to liability under the FCPA and damage the Company's business, finances, and prospects for future growth and success.  S. Wynn utterly failed to act to prevent this enormous wealth transfer and unconscionable waste of corporate assets that exposes the Company to hundreds of millions of dollars in liability.   Wynn paid S. Wynn the following compensation as an executive:

| Year | Salary | Bonus | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|-------|----------------------------------------|------------------------|-------|
| 2010 | $2,950,000 | $3,218,750 | $6,906,250 | $1,540,779 | $14,615,779 |

S. Wynn is a resident of Nevada.

15.    Defendant E. Wynn is a Wynn director and has been since October 2002.  E. Wynn is the former wife of defendant S. Wynn.  E. Wynn approved the transfer of the HK$1 billion (about US$135 million) to the University of Macau.  E. Wynn knew, or was reckless in not knowing, that the transfer to the University of Macau Development Foundation would expose the Company to liability under the FCPA and damage the Company's business, finances, and prospects for future growth and success.  E. Wynn utterly failed to act to prevent this enormous wealth transfer and unconscionable waste of corporate assets that exposes the Company to hundreds of millions of dollars in liability.   Wynn paid E. Wynn the following compensation as a director:

| Year | Fees Paid in Cash | Total |
|------|-------------------|-------|
| 2010 | $69,000 | $69,000 |

E. Wynn is a resident of Nevada.

16.    Defendant Marc D. Schorr ("Schorr") is Wynn's Chief Operating Officer ("COO") and has been since June 2002 and a director and has been since July 2010.  Schorr is also a

director of Wynn Macau and has been since September 2009, and a director of WRM.  Schorr is a member of Wynn's Gaming Compliance Committee and has been since at least April 2011. Schorr approved the transfer of the HK$1 billion (about US$135 million) to the University of Macau.  Schorr knew, or was reckless in not knowing, that the transfer to the University of Macau Development Foundation would expose the Company to liability under the FCPA and damage the Company's business, finances, and prospects for future growth and success.  Schorr utterly failed to act to prevent this enormous wealth transfer and unconscionable waste of corporate assets that exposes the Company to hundreds of millions of dollars in liability.  Wynn paid Schorr the following compensation as an executive:

| Year | Salary | Bonus | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|-------|----------------------------------------|------------------------|-------|
| 2010 | $1,838,462 | $600,000 | $3,400,000 | $2,307,923 | $8,146,385 |

Schorr is a resident of Nevada.

17.    Defendant Linda Chen ("Chen") is a Wynn director and has been since October 2007.  Chen is also a director of Wynn Macau and has been since September 2009; COO of Wynn Macau and WRM and has been since June 2002; and President of Wynn International Marketing, Limited, a wholly-owned indirect subsidiary of the Company, and has been since January 2005.  Chen is the Company's primary marketing executive and manages its global marketing efforts, and is involved in the operations and strategic development of Wynn Macau. Chen approved the transfer of the HK$1 billion (about US$135 million) to the University of Macau.  Chen knew, or was reckless in not knowing, that the transfer to the University of Macau Development Foundation would expose the Company to liability under the FCPA and damage the Company's business, finances, and prospects for future growth and success.  Chen utterly failed to act to prevent this enormous wealth transfer and unconscionable waste of corporate

assets that exposes the Company to hundreds of millions of dollars in liability.  Wynn paid Chen the following compensation as a director:

| Year | Salary | Bonus | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|-------|-----------------------------------------|------------------------|-------|
| 2010 | $1,417,308 | $1,000,000 | $2,000,000 | $1,788,762 | $6,206,070 |

Chen is a resident of Macau and Nevada.

18.    Defendant Allan Zeman ("Zeman") is a Wynn director and has been since October 2002.  Zeman is also Vice Chairman of the Board and a director of Wynn Macau and has been since September 2009.  Zeman is a member of Wynn's Audit Committee and has been since at least April 2011.  Zeman has been closely involved in the development, continued operation, and strategic focus of Wynn Macau.  He is also closely involved in the Company's background, development, and marketing strategy in Asia and provides the Board with guidance into these areas of operation.  Zeman approved the transfer of the HK$1 billion (about US$135 million) to the University of Macau.  Zeman knew, or was reckless in not knowing, that the transfer to the University of Macau Development Foundation would expose the Company to liability under the FCPA and damage the Company's business, finances, and prospects for future growth and success.  Zeman utterly failed to act to prevent this enormous wealth transfer and unconscionable waste of corporate assets that exposes the Company to hundreds of millions of dollars in liability.  Wynn paid Zeman the following compensation as a director:

| Year | Fees Paid in Cash | Option Awards | All Other Compensation | Total |
|------|-------------------|---------------|------------------------|-------|
| 2010 | $114,000 | $234,637 | $63,750 | $412,387 |

Zeman is a resident of Hong Kong.

19.    Defendant Alvin V. Shoemaker ("Shoemaker") is a Wynn director and has been since December 2002.  Shoemaker is also a member of Wynn's Audit Committee and has been since at least April 2011.  Shoemaker approved the transfer of the HK$1 billion (about US$135 million) to the University of Macau.  Shoemaker knew, or was reckless in not knowing, that the

transfer to the University of Macau Development Foundation would expose the Company to liability under the FCPA and damage the Company's business, finances, and prospects for future growth and success. Shoemaker utterly failed to act to prevent this enormous wealth transfer and unconscionable waste of corporate assets that exposes the Company to hundreds of millions of dollars in liability. Wynn paid Shoemaker the following compensation as a director:

| Year | Fees Paid in Cash | Option Awards | All Other Compensation | Total |
|------|------|------|------|------|
| 2010 | $123,250 | $234,637 | $63,750 | $421,637 |

Shoemaker is a resident of Idaho.

20.     Defendant D. Boone Wayson ("Wayson") is a Wynn director and has been since August 2003. Wayson is also Chairman of Wynn's Audit Committee and has been since at least April 2011. Wayson approved the transfer of the HK$1 billion (about US$135 million) to the University of Macau. Wayson knew, or was reckless in not knowing, that the transfer to the University of Macau Development Foundation would expose the Company to liability under the FCPA and damage the Company's business, finances, and prospects for future growth and success. Wayson utterly failed to act to prevent this enormous wealth transfer and unconscionable waste of corporate assets that exposes the Company to hundreds of millions of dollars in liability. Wynn paid Wayson the following compensation as a director:

| Year | Fees Paid in Cash | Option Awards | All Other Compensation | Total |
|------|------|------|------|------|
| 2010 | $135,250 | $234,637 | $63,750 | $433,637 |

Wayson is a resident of Maryland.

21.     Defendant Russell Goldsmith ("Goldsmith") is a Wynn director and has been since May 2008. Goldsmith is also a member of Wynn's Audit Committee and has been since at least April 2011. Goldsmith approved the transfer of the HK$1 billion (about US$135 million) to the University of Macau. Goldsmith knew, or was reckless in not knowing, that the transfer to the University of Macau Development Foundation would expose the Company to liability under

the FCPA and damage the Company's business, finances, and prospects for future growth and success.  Goldsmith utterly failed to act to prevent this enormous wealth transfer and unconscionable waste of corporate assets that exposes the Company to hundreds of millions of dollars in liability.  Wynn paid Goldsmith the following compensation as a director:

| Year | Fees Paid in Cash | Option Awards | All Other Compensation | Total |
|------|-------------------|---------------|------------------------|-------|
| 2010 | $117,000 | $234,637 | $21,250 | $372,887 |

Goldsmith is a resident of California.

22.     Defendant Robert J. Miller ("Miller") is a Wynn director and has been since October 2002.  Miller was also Wynn's Presiding Director and Compliance Director in 2011.  Miller is Chairman of Wynn's Gaming Compliance Committee and has been since at least April 2011.  Miller approved the transfer of the HK$1 billion (about US$135 million) to the University of Macau.  Miller knew, or was reckless in not knowing, that the transfer to the University of Macau Development Foundation would expose the Company to liability under the FCPA and damage the Company's business, finances, and prospects for future growth and success.  Miller utterly failed to act to prevent this enormous wealth transfer and unconscionable waste of corporate assets that exposes the Company to hundreds of millions of dollars in liability.  Wynn paid Miller the following compensation as a director:

| Year | Fees Paid in Cash | Option Awards | All Other Compensation | Total |
|------|-------------------|---------------|------------------------|-------|
| 2010 | $170,500 | $234,637 | $63,750 | $468,887 |

Miller is a resident of Nevada.

23.     Defendant John A. Moran ("Moran") is a Wynn director and has been since October 2002.  Moran approved the transfer of the HK$1 billion (about US$135 million) to the University of Macau.  Moran knew, or was reckless in not knowing, that the transfer to the University of Macau Development Foundation would expose the Company to liability under the FCPA and damage the Company's business, finances, and prospects for future growth and

- 11 -

success. Moran utterly failed to act to prevent this enormous wealth transfer and unconscionable waste of corporate assets that exposes the Company to hundreds of millions of dollars in liability. Wynn paid Moran the following compensation as a director:

| Year | Fees Paid in Cash | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2010 | $119,750 | $234,637 | $63,750 | $418,137 |

Moran is a resident of Florida.

24.     Defendant Ray R. Irani ("Irani") is a Wynn director and has been since October 2007. Irani approved the transfer of the HK$1 billion (about US$135 million) to the University of Macau. Irani knew, or was reckless in not knowing, that the transfer to the University of Macau Development Foundation would expose the Company to liability under the FCPA and damage the Company's business, finances, and prospects for future growth and success. Irani utterly failed to act to prevent this enormous wealth transfer and unconscionable waste of corporate assets that exposes the Company to hundreds of millions of dollars in liability. Wynn paid Irani the following compensation as a director:

| Year | Fees Paid in Cash | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2010 | $116,500 | $234,637 | $42,500 | $393,637 |

Irani is a resident of California.

25.     The defendants identified in ¶¶14, 16-17 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶14-24 are referred to herein as the "Director Defendants." The defendants identified in ¶¶18-21 are referred to herein as the "Audit Committee Defendants." Collectively, the defendants identified in ¶¶14-24 are referred to herein as the "Individual Defendants."

/ / /

/ / /

/ / /

- 12 -

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

26.     By reason of their positions as officers, directors, and/or fiduciaries of Wynn and because of their ability to control the business and corporate affairs of Wynn, the Individual Defendants owed and owe Wynn and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Wynn in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Wynn and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

27.     Each officer and director of the Company owes to Wynn and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.   In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations and management so that the market price of the Company's stock would be based on truthful and accurate information.

**Additional Duties of the Audit Committee Defendants**

28.     In addition to these duties, under the Company's Audit Committee Charter, the Audit Committee Defendants, defendants Goldsmith, Shoemaker, Wayson, and Zeman, owed specific duties to Wynn to review and approve the Company's compliance program with respect to legal and regulatory compliance and the Company's policies and procedures for monitoring compliance.   In particular, the Audit Committee Charter states the Audit Committee is to "[r]eview with the [Company's] legal advisers legal matters that may have a material effect on financial statements, the [Company's] compliance policies and any material reports or inquiries

received from regulators or governmental agencies relating to any matter that may have a material effect on the [Company's] financial statements."  Moreover, the Audit Committee is responsible for reviewing and approving the Company's major risk exposures and the policies and procedures in place to monitor and control such exposures.

**Additional Duties of the Individual Defendants under the Code**

29.     In addition to these duties, under the Company's Code of Business Conduct and Ethics ("Code"), the Individual Defendants owed specific duties to Wynn that go above and beyond their fiduciary duties imposed by law.  Indeed, the Code is "to reinforce and enhance the Company's commitment to an ethical way of doing business."   The Code applies to all employees, officers, and directors.  The Code also requires the Individual Defendants to avoid conflicts of interests, avoid taking corporate opportunities, and not offer gifts or other goods or monies in exchange for favoring the Company's business.

30.     The Code provides that:

The Company operates in more than one country and interacts with many different cultures. What is appropriate in some parts of the world may be entirely inappropriate or even unlawful in others. You should always abide by the laws, rules and regulations of the country in which you are conducting business, the federal law of the United States of America and applicable laws of the State of Nevada and the Macau Special Administrative Region. You should also abide by generally accepted business practices of the countries in which you are conducting business, unless they conflict with any of the foregoing laws, rules and regulations, in which case you are to abide by the law. If there is a conflict between local laws and this Code or any other law applicable to the conduct of the Company's business, you should consult with the Legal Department before taking any action.

31.     Regarding bribery and violations of the FCPA, section 6.3 of the Code states:

**6.3 Prohibition on Bribery of Government Officials**

The Company's Policy Regarding Payments to Foreign Officials, the U.S. Foreign Corrupt Practices Act (the "FCPA"), and the laws of many other countries prohibit the Company and its officers, employees and agents or other third parties

- 14 -

from giving or offering to give money or anything of value, directly or through an intermediary, to a foreign official, employees of a state-owned company, a foreign political party, a party official or a candidate for political office in order to attempt to influence official acts or decisions of that person or entity, to obtain or retain business, or to secure any improper advantage.

Please refer to the Company's Policy Regarding Payments to Foreign Officials for more details regarding prohibited payments to foreign government officials.

**Additional Duties of the Gaming Compliance Committee Defendants**

32.     In addition to these duties, the Company's Gaming Compliance Committee owed specific duties to Wynn to that go above and beyond their fiduciary duties imposed by law. The Gaming Compliance Committee is comprised of defendants Miller and Schorr ("the Gaming Compliance Committee Defendants") and non-defendant John Strzemp, the Company's Executive Vice President and Chief Administrative Officer.     The Gaming Compliance Committee's purpose is to assist the Company in maintaining the highest level of regulatory compliance. Moreover, the Gaming Compliance Committee is not an independent committee of the Board.

**Control, Access, and Authority**

33.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of Wynn, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

34.     Because of their advisory, executive, managerial, and directorial positions with Wynn, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and growth prospects of Wynn. While in possession of this material, non-public information, the Individual Defendants caused Wynn to make improper payments to the University of Macau Development Foundation as a quid pro quo for obtaining land concession agreements.

35.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Wynn, and was at all times acting within the course and scope of such agency.

**Reasonable and Prudent Supervision**

36.     To discharge their duties, the officers and directors of Wynn were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Wynn were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations;

(b)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(c)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

(d)     remain informed as to how Wynn conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws.

**Breaches of Duties**

37.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of

the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Wynn, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company have been ratified by the remaining Individual Defendants who collectively comprised all of Wynn's Board.

38.     The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to pledge $135 million to the University of Macau Development Foundation in violation of law and threatening the Company's gaming licenses. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

39.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

40.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including shareholders of Wynn, regarding the Individual Defendants' management of Wynn's operations and violations of law; (ii) waste corporate assets so that the Individual Defendants could personally profit via increased compensation; (iii) enhance the Individual

Defendants' executive and directorial positions at Wynn and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

41.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct. During this time, the Individual Defendants caused the Company to violate the FCPA and Nevada gaming laws.

42.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's improper payments to the University of Macau Development Foundation.

43.     Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

44.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

/ / /

/ / /

**FCPA COMPLIANCE AND NEVADA GAMING REGULATIONS**

45.     Wynn stock is traded on the New York Stock Exchange under the symbol "Wynn." As an issuer under the U.S. federal securities laws, Wynn's business and operations are subject to the requirements of the FCPA.

46.     The FCPA, first enacted in 1977, made it unlawful for U.S. issuers of registered securities (i.e., corporations), or any person acting at their behest, to make improper payments to any foreign official or government in order to obtain or retain business. 15 U.S.C. §78dd-l. In addition, the FCPA established accounting control requirements for issuers subject to either the registration or reporting provisions of the Securities Exchange Act of 1934 (the "Exchange Act"). 15 U.S.C. §78m. In particular, the FCPA requires every issuer with a class of securities registered pursuant to section 12 of the Exchange Act to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer.

47.     The FCPA also requires covered companies to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that: (i) transactions are executed in accordance with management's authorization; and (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with Generally Accepted Accounting Principles ("GAAP") or any other criteria applicable to such statements, and to maintain accountability for assets.

48.     In addition, because Wynn is incorporated and headquartered in Nevada, it must comply with the gaming laws of the state, which prohibit "unsuitable" associations that "reflect or tend to reflect discredit [or disrepute] upon the State of Nevada or the gaming industry." Nevada law imposes comprehensive regulatory requirements upon gaming licensees, including obligations that those associated with the licensee possess the necessary character, qualifications,

- 19 -

and integrity to be suitable to hold that privilege so as to not pose a threat to the public interest or the integrity of the regulation and control of gaming.   In particular, the Nevada gaming regulations are as follows, in pertinent part:

> 5.011 Grounds for disciplinary action. The board and the commission deem any activity on the part of any licensee, his agents or employees, that is inimical to the public health, safety, morals, good order and general welfare of the people of the State of Nevada, or that would reflect or tend to reflect discredit upon the State of Nevada or the gaming industry, to be an unsuitable method of operation and shall be grounds for disciplinary action by the board and the commission in accordance with the Nevada Gaming Control Act and the regulations of the board and the commission. Without limiting the generality of the foregoing, the following acts or omissions may be determined to be unsuitable methods of operation....

49.    Unsuitable methods of operation may include: failure to conduct gaming operations in accordance with proper standards of custom, decorum and decency, or permit any type of conduct in the gaming establishment which reflects or tends to reflect on the repute of the State of Nevada and act as a detriment to the gaming industry.

50.    Since Macau's return to Chinese rule in December 1999, its immensely profitable gambling industry has opened its doors to domestic and foreign entities seeking to develop casino resorts.  In fact, in 2006, gambling revenue in Macau surpassed that of Las Vegas, and in 2010, Macau's gaming revenue quadrupled that of Las Vegas.  However, Macau has been plagued by political corruption and the influence of organized crime.  For example, in January 2008, Ao Man Long, Macau's Secretary for Transport and Public Works, was convicted of taking more than $100 million in bribes, laundering money, and abusing his power to help property developers win lucrative government construction deals and contracts linked to casino construction.

51.    Wynn is also on notice of the SEC and DOJ's knowledge of its competitor casinos' improper conduct related to obtaining gaming business in Macau and Asia.  For example, one of the Company's main competitors, Las Vegas Sands, received a subpoena from

the SEC requesting that the company produce documents relating to its compliance with the FCPA after a lawsuit was filed claiming it had violated the FCPA by using improper leverage on Macau officials to garner gaming business. Las Vegas Sands has also been advised by the DOJ that it is conducting a similar investigation. Moreover, the Nevada Gaming Control Board and the Federal Bureau of Investigation have initiated investigations into Las Vegas Sands regarding its ties to the Triads, an organized crime syndicate in China and Macau, which would potentially run afoul of Nevada gaming regulations.

## FACTUAL BACKGROUND

52.     Defendant S. Wynn has spent four decades developing casinos, hotels, and luxury properties in Las Vegas, Atlantic City, and Biloxi, Mississippi, raising the financial stakes with each new venture. S. Wynn founded Mirage Resorts, Inc. and used it to transform the Las Vegas Strip by building such mega-resorts as Treasure Island, Mirage, Bellagio, Wynn Las Vegas, and the Encore at Wynn Las Vegas. In June 2000, after a bruising board room battle, which centered on allegations that S. Wynn misappropriated company funds, S. Wynn was ousted as CEO of Mirage Resorts, Inc.

53.     In 2000, not long after defendant S. Wynn lost control of Mirage Resorts, Inc. to MGM Grand Inc., and unable to find other investors to invest in his ideas, he and Okada formed a 50-50 partnership – later named Wynn Resorts – to build casinos in Las Vegas under S. Wynn's direction.

54.     Beginning in November 2000, defendant S. Wynn used a Nevada limited liability company, Valvino Lamore, LLC ("Valvino"), to embark on his new development with Okada. Okada's Nevada corporation, Aruze, made a contribution of $260 million to Valvino in exchange for a 50% interest in Valvino. This contribution was the seed capital that would remake the

Desert Inn and allowed for the development of Wynn Resorts. In April 2002, Aruze made two additional contributions totaling $120 million.

55.     At a hearing before the Nevada State Gaming Control Board and Nevada Gaming Commission, on June 4, and 17, 2004, respectively, defendant S. Wynn affirmed that "Mr. Okada was not only suitable" to receive a gaming license in the state of Nevada, "but he was desirable." Repeatedly referring to Okada as his "partner," S. Wynn said Okada was "dedicated to the pursuit of excellence." In his sworn testimony, S. Wynn also stated "I have never dreamed that there would be a man as supportive, as long-term thinking, as selfless in his investment as Mr. Okada."

56.     On September 28, 2002, Valvino was rolled into Wynn. Thereafter, Okada became a board member of Wynn. On October 25, 2002, Wynn held an Initial Public Offering ("IPO"). Okada and defendant S. Wynn each owned about 30% of the Company's outstanding stock after the IPO.

57.     On April 28, 2005, Wynn Las Vegas opened. It was an instant success. Following the success of Wynn Las Vegas and Encore at Wynn Las Vegas, defendant S. Wynn turned his and the Company's attention to Asia, where millions of people are emerging from poverty, growing rich and looking for ways to enjoy that new wealth. S. Wynn approached this new market with as much energy, enthusiasm, and flamboyance as he did when he kicked off his career in Las Vegas in the early 1970s.

58.     Wynn spent $1.1 billion on its Wynn Macau, a casino resort that opened in 2006 on the Macau Peninsula. The resort today has 595 rooms and suites and 205,000 square feet of casino space. Wynn has spent a further $550 million on the Wynn Macau by adding on an all-suite tower called the Encore Tower, which opened a year ago. Designed to draw an upmarket

crowd, the Encore Tower features 414 suites and villas with an average room size of 1,000 square feet.

59.     Seeking to expand further, Wynn has submitted an application for plans to build a $3 billion property on a fifty-one-acre site on Macau's Cotai Strip, which defendant S. Wynn has told the media that this expansion could easily double the size of Wynn's business in Macau by 2015.  Wynn, however, needed to obtain land lease agreements from the Macau government to build and conduct the casino and hotel operations.

### SUBSTANTIVE ALLEGATIONS

60.     The government of Macau owns most of the land in Macau.  Macau is a special administrative region of China, although it operates with its own autonomous government.  The government of Macau owns most of the land in Macau.  In most cases, private interests in real property located in Macau are obtained through long-term leases called land concession agreements and other grants of rights to use land from the government.  Notably, the University of Macau is run by the Macau government.  The Chancellor of the University of Macau is also the head of Macau's government, with ultimate oversight of gaming matters.  In 2009, the University of Macau Development Foundation was founded to help grow the University of Macau.  Most importantly, the Macau government has authority over Wynn Macau's current gaming concessions and the ability to grant future concessions necessary for Wynn to either continue to operate in Macau or to expand its operations in Macau.

61.     Wynn Macau and the Encore at Wynn Macau operate under a twenty-year land concession agreement granted by the Macau government in June 2002.  Currently, the Macau operations include approximately 265,000 square feet of casino gaming space, (including a sky casino and private gaming salons), casual and fine dining in eight restaurants, two spas and a salon, lounges, meeting facilities, and approximately 54,200 square feet of retail space.  The

Macau operations provided about $3.79 billion of net revenue for Wynn in 2011 while the Las Vegas operations provided $1.48 billion in net revenues for Wynn in 2011.

62.     Wynn's operations in Macau are undeniably important to its current and future prospects.  According to industry reports, Macau is now the gambling capital of the world and revenue from gambling operations in Macau is expected to grow 35% to $32 billion.  Wynn plans to open another casino resort in Macau in 2014 or 2015.  This, however, would require another land concession agreement that would take years to obtain.  In a Form 8-K filed with the SEC on February 27, 2006, the Company first announced to the public that it had submitted an application to the Macau government for a land concession for fifty-four acres on the Cotai Strip.  In February 2011, defendant S. Wynn indicated the budget for the Cotai project could be as much as $2.5 billion.  At the same time, he stated that Wynn still needed the Macau government's permission to begin construction on the Cotai project.

63.     After five years, the Company still had not received the land concession agreement necessary to develop its second resort in Macau.  In order to help push the land concession agreement along, in May 2011, fifteen of sixteen of the Company's then directors approved the $135 million "donation" to the University of Macau Development Foundation.  Okada was the lone director that did not vote for the donation.  The donation consisted of an immediate $25 million payment, made in May 2011, and a commitment for additional annual donations of $10 million from 2012 through 2022.  The $135 million represents approximately 70% of the University of Macau Development Foundation's overall endowment.  Not coincidentally, Wynn's concession agreement on its first resort in Macau, the Wynn Macau and Encore Tower, expires in 2022 – the year of the last payment of the pledge.  If the first land concession agreement is not extended past June 2022, Wynn's Form 10-K filed with the SEC on

February 29, 2012, states that "all of our gaming operations and related equipment located in defined areas of our casino in Macau will be automatically transferred to the Macau government without compensation to us and we will cease to generate any revenues from these operations." This disclosure in the Company's most recent Form 10-K demonstrates that the success of getting an extension of the first land concession agreement is vitally important to the Company's future revenue.

64.    In June 2011, a mere month after its donation to the University of Macau Development Foundation, the Company announced to the Hong Kong stock exchange that it "formally accepted the terms and conditions of a land concession contract [from the Macau government] for approximately 51 acres of land" and had already placed a fence bearing the Wynn logo around the block.

65.    On September 12, 2011, Wynn Macau formally announced it had signed a land concession agreement with the Macau government.   The land concession agreement would permit the Company to build its second casino-resort in Macau.   Wynn Macau said it formally accepted the land concession agreement to build on fifty-one acres in Macau's Cotai district.   The new resort will feature a hotel, casino, shopping, restaurants, entertainment, spa, and convention space.   In December 2011, Wynn paid the initial deposit of $62.5 million pursuant to the draft land concession agreement.

**The Lawsuits Resulting from the Donation Reveal the Truth Behind the Donation**

66.    On January 11, 2012, Okada filed the Petition against Wynn in the District Court of Clark County, Nevada, seeking the Company's books and records for inspection by his counsel.   *See Okada v. Wynn Resorts, Ltd.*, Case No.: A-12---654522-B, Department XI. Among other things, Okada's Petition questions the propriety of Wynn's donations to the University of Macau Development Foundation.

67.     On January 27, 2012, Wynn sought to dismiss the Okada lawsuit by claiming it contained claims that are "innuendo, hyperbole, half-truths and sweeping generalizations."  At a hearing on February 9, 2012, the Nevada State Court ruled that Okada has the right to "reasonable" access to internal Company documents.

68.     On February 13, 2012, the Company filed a Form 8-K with the SEC that announced on February 8, 2012, the Company received a letter from the SEC requesting that, in connection with an informal inquiry by the SEC, the Company preserve information relating to the donation of the University of Macau, any donations by the Company to any other education charitable institutions, including the University of Macau Development Foundation, and the Company's casino or concession gaming licenses or renewals in Macua.

69.     On February 15, 2012, Wynn noticed a special meeting of the Board.    The meeting was set for Saturday, February 18, 2012, at 9:00 a.m. in Las Vegas, which is 2:00 a.m. Sunday morning in Japan, which is where Okada is citizen of and where he was at the time.

70.     On February 19, 2012, Wynn Resorts sued Okada, Aruze, and Universal (another Okada owned entity).  The lawsuit alleged a claim of breach of fiduciary duty against Okada for the exact same type of wrongdoing he alleged against the Board, i.e., Okada had made separate and distinct payments to foreign gaming officials to advance his and Wynn's business interests in violation of the FCPA.  As an exhibit, the complaint contained the Freeh Report.  The Freeh Report contends that substantial evidence exists that Okada and his associates made gifts and payments to the two chief gaming regulators of the Philippines Amusement and Gaming Corporation in an amount exceeding $100,000.  This includes a stay at the Wynn Macau in one of the Encore Luxury Villas, with a nightly rate of $6,000.

71.   Okada disputes the Company's version of events surrounding his removal from the Wynn Macau Board and the attempt to redeem his shares.  He explains in his counterclaim that he was not allowed any involvement in Freeh Sporkin's investigations before the issuance of the Freeh Report, including any opportunity to respond to the allegations in the report or address any of the evidence it cites.

72.   On February 15, 2012, hours after the completion of the Freeh Report, Wynn noticed a Board meeting for Saturday, February 18, 2012, at 9:00 a.m. in Las Vegas, which is 2:00 a.m. Sunday morning in Japan, where Okada resides.  According to the counterclaim, prior to the special meeting of the Board, defendant S. Wynn communicated to Aruze through intermediaries that, instead of having the Board consider the Freeh Report, S. Wynn would be willing to buy Aruze's stock for his benefit at a significant discount.  A sale to S. Wynn was presented as an alternative to the embarrassment and regulatory issues attendant to possible disclosure of the Freeh Report.  Okada rejected this offer.

73.   On February 21, 2012, the Company purportedly redeemed 24,549,222 shares of the Company's common stock held by Aruze.  Wynn "redeemed" Okada's 24,549,222 shares, valued at $2.77 billion, for a $1.9 billion promissory note to be paid in ten years.  This payment is a 30% discount to the market value of his stake, not including the cost of the ten-year waiting period.  The promissory note pays a measly 2% annual interest.  Aruze disputes that any redemption has occurred and also argues that the unilateral, blanket 30% discount that Wynn applied to the redemption of Aruze's shares is unfair.  Aruze claims that the redemption is invalid under the Company's articles of incorporation because the shares can only be redeemed in three situations.  First, when it "is determined by a Gaming Authority to be unsuitable" for the shareholder to be engaged in gaming activities the articles of incorporation permit redemption.

Second, Wynn can redeem when a person "causes the Corporation or any Affiliated Company to lose or to be threatened with the loss of any Gaming License." Third, the articles of incorporation allow for redemption when a person is likely to "jeopardize the Corporation's or any Affiliated Company's [a] application for, [b] receipt of approval for, [c] right to the use of, or [d] entitlement to, any Gaming License." Okada claims that none of these three conditions apply. In fact, if Okada's allegations are true, defendant S. Wynn and the rest of the Board may potentially have their shares redeemed due to their approval of the donation to the Macau University Development Foundation, which Okada voted against.

74. On February 24, 2012, Wynn Macau, issued a press release announcing that its Board had removed Okada. Wynn's Board cannot, however, remove Okada because only the shareholders can do so under Nevada law.

75. On March 12, 2012, Aruze and Universal filed a counterclaim and answer to Wynn's complaint. Among other things, the counterclaim alleges that the redemption was void *ab initio* because the Stockholders Agreement between defendants S. Wynn and E. Wynn and Okada either precludes the redemption of Aruze stock altogether or, alternately, the transfer restrictions are not binding on Aruze to the extent that they constitute an illegal restraint on alienability. Furthermore, the counterclaim alleges that in determining the redemption price for Aruze's almost 20% stake in the Company, Wynn relied solely on one opinion from Moelis & Company ("Moelis"), which has done business with Wynn in the past, and was anything but independent. The Counterclaim explains:

> Mr. Wynn and Kenneth Moelis ("Mr. Moelis") – the founder of Moelis – go way back. Mr. Moelis first worked with Mr. Wynn when Mr. Moelis worked at the investment banking firm of Drexel Burnham Lambert ("Drexel"). At Drexel, Mr. Moelis was the banker who helped Mr. Wynn finance his Golden Nugget Casino in Atlantic City and Mirage Casino in Las Vegas. On information and belief, Mr. Wynn has a close personal and professional relationship with Mr. Moelis.

According to press reports, Mr. Moelis has stated that he would take the first flight out of LAX to rush to the assistance of Mr. Wynn. Mr. Wynn reciprocates Mr. Moeli's loyalty and support. Mr. Wynn engaged Mr. Moelis to serve as the lead underwriter of Wynn Resorts' $210 million common stock offering in March 2009.

* * *

Mr. Wynn called on Mr. Moelis' loyalty in this case. Despite the fact that at least some of the stock was exempted from the Stockholders Agreement, Moelis discounted Aruze USA's more than $2.7 billion shares of Wynn Resort stock by around 30%.

76.    The lawsuits and counterclaim also shed light on the pledge to the University of Macau Development Foundation. The pledge was considered and approved not only by Wynn Macau's Board, but also by Wynn's Board (with the exception of Okada in both votes). Each of the Individual Defendants voted to approve the pledge and commit Wynn's assets.

77.    According to Okada's counterclaim filed by Aruze and Universal:

Mr. Okada objected to the unprecedented size and duration of the commitment. It was unclear how the University of Macau would use the funds. Mr. Okada wondered why a wealthy university that sits on government land and largely caters to non-Macau residents might need or want such a large donation. Mr. Okada, who is himself a significant philanthropist, wondered whether such a donation actually benefits the people who live in Macau. He was concerned about the lack of deliberation of the boards of Wynn Resorts and Wynn Macau (the donation was approved at a joint meeting [of the two boards] in Macau[]), and that pending approvals in Macau related to a new development in Cotai, and the coincidence of the date of the donation and the term of Wynn Macau's gaming license in Macau, might make it appear that Wynn Macau and Wynn Resorts were paying for benefits.

78.    The counterclaim further alleges that Wynn claims to have received a legal opinion sanctioning the donation. But Wynn never provided that legal opinion to Okada or to any other members of the Board of Wynn or Wynn Macau.

79.    It should also be noted that the Company's donation to the University of Macau Development Foundation was not the first such gift lavished on the Macau government. The Company presented other major gifts to Macau, including a $13 million Chinese vase quartet

- 29 -

that defendant S. Wynn unveiled at an October press conference with the former chief executive of Macau.

## DAMAGES TO WYNN

80.     As a result of the Individual Defendants' improprieties, Wynn spent $25 million (with a commitment of another $110 million) on a donation that subjects it to significant liability. Allegations of corruption are particularly damaging in the highly regulated casino industry, and the Company may be particularly vulnerable since the accusations are being made at a time when U.S. regulators are pursuing a record-breaking number of anti-corruption investigations.   In addition to the high cost of defending against an FCPA investigation and potential prosecution, the Company's ability to maintain current, and secure future, gaming licenses has been put in jeopardy.   As was recently stated in an article in the *New York Times*, "[t]he company may well see its legal costs take a sizable bite out of profits over the next few quarters."   Further, as a direct and proximate result of the Individual Defendants' actions, Wynn has expended, and will continue to expend, significant sums of money.   Such expenditures include, but are not limited to:

> (a)     costs incurred from complying with the SEC's informal inquiry;
>
> (b)     tens of millions of dollars in legal fees related to the FCPA investigation;
>
> (c)     costs incurred from legal fees related to trying to squeeze out Okada and Azure, including the Freeh investigation and ongoing litigation;
>
> (d)     potential loss of its Nevada gaming license; and
>
> (e)     costs incurred from compensation and benefits paid to the defendants who have breached their duties to Wynn.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

81.   Plaintiff brings this action derivatively in the right and for the benefit of Wynn to redress injuries suffered, and to be suffered, by Wynn as a direct result of breach of fiduciary duties, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.   Wynn is named as a nominal defendant solely in a derivative capacity.   This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

82.   Plaintiff will adequately and fairly represent the interests of Wynn in enforcing and prosecuting its rights.

83.   Plaintiff was a shareholder of Wynn at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current Wynn shareholder.

84.   The current Board of Wynn consists of the following twelve individuals: defendants S. Wynn, Schorr, Chen, Zeman, Miller, Shoemaker, Wayson, Goldsmith, Moran, E. Wynn, and Irani, and non-defendant Okada.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act.

85.   First and foremost, Wynn is run by defendant S. Wynn and all the directors are inherently conflicted and loyal to him and him alone.  As a former board member explains, through Aruze, "Mr. Wynn, has run Wynn Resorts as a personal fiefdom, packing the Board with friends who do his personal bidding, and paying key executives exorbitant amounts for their unwavering fealty."  Thus, S. Wynn dominates and controls the Board through his significant ownership and control over the Board.

86.   The principal professional occupation of defendant Schorr is his employment with Wynn, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits as alleged above.   Accordingly, defendant Schorr lacks

independence from defendant S. Wynn due to his interest in maintaining his executive position at Wynn. This lack of independence renders defendant Schorr incapable of impartially considering a demand to commence and vigorously prosecute this action. Wynn paid defendant Schorr the following compensation:

| Year | Salary | Bonus | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|-------|----------------------------------------|------------------------|-------|
| 2010 | $1,838,462 | $600,000 | $3,400,000 | $2,307,923 | $8,146,385 |

Therefore, defendant Schorr is incapable of impartially considering a demand to commence and vigorously prosecute this action because he has an interest in maintaining his principal occupation and the substantial compensation he receives in connection with that occupation. Demand is futile as to defendant Schorr.

87.     The principal professional occupation of defendant Chen is her employment with Wynn, pursuant to which she has received and continues to receive substantial monetary compensation and other benefits as alleged above. Accordingly, defendant Chen lacks independence from defendant S. Wynn due to her interest in maintaining her executive position at Wynn Macau. This lack of independence renders defendant Chen incapable of impartially considering a demand to commence and vigorously prosecute this action. Wynn paid defendant Chen the following compensation:

| Year | Salary | Bonus | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|-------|----------------------------------------|------------------------|-------|
| 2010 | $1,417,308 | $1,000,000 | $2,000,000 | $1,788,762 | $6,206,070 |

Therefore, defendant Chen is incapable of impartially considering a demand to commence and vigorously prosecute this action because she has an interest in maintaining her principal occupation and the substantial compensation she receives in connection with that occupation. Demand is futile as to defendant Chen.

88.     Moreover, defendant E. Wynn cannot comply with her fiduciary duties to independently consider a pre-suit demand to bring the claims alleged herein because she was from 1963 to 1986 and from 1991 to 2009, the spouse of defendant S. Wynn.  Moreover, the Company employs E. Wynn's brother as a Senior Executive Host of Wynn Las Vegas and his wife as Host at Wynn Las Vegas.  E. Wynn's brother was paid a base salary and bonus of $126,943, and other compensation of $1,891.  E. Wynn's sister-in-law was paid a base salary of $185,923 and other compensation of over $370,000.

89.     According to its 2011 proxy statement, Wynn acknowledges that defendants S. Wynn, E. Wynn, Schorr, and Chen are not independent directors because they do not meet the independence criteria of the NASDAQ listing standards.  Therefore, under applicable NASDAQ standards, these four defendants cannot be considered independent and would be unable to fulfill their fiduciary obligations to consider a pre-suit demand with the required degree of impartiality and objectivity.

**Demand Is Excused Because the Director Defendants' Conduct Is Not a Valid Exercise of Business Judgment**

90.     Defendants S. Wynn, Schorr, Chen, Zeman, Miller, Shoemaker, Wayson, Goldsmith, Moran, E. Wynn, and Irani's challenged misconduct at the heart of this case constitutes a threat to the Company's very survival.  Despite knowing the high risks of violating the FCPA and the corruption involved in operating in countries with less-developed legal and regulatory systems, defendants nevertheless conducted Wynn's business without establishing and maintaining systems of internal controls for compliance with the FCPA.  By doing so, defendants deprived Wynn of the internal controls and systems for FCPA compliance necessary to help detect, deter, and ultimately prevent the improper payments at issue in this action.

- 33 -

91.     All of the Board (except Okada and defendant S. Wynn) voted in favor of the donation to the University of Macau Development Foundation without any evidence that such a donation was compliant with the law and the Company's policies. While S. Wynn claims to have received a legal opinion sanctioning the unprecedented donation, S. Wynn did not provide that legal opinion to the Board before the vote. Further, it does not appear any director other than Okada requested to see the legal opinion sanctioning the donation. Basing a vote to approve a $135 million donation to a foreign government institution without even reviewing the legal opinion permitting the payment is not a valid exercise of business judgment. Thus, demand on the Board is futile, and therefore, excused.

92.     As the ultimate decision-making body of the Company, the Board affirmatively adopted, implemented, and condoned a business strategy based on a deliberately-improper activity, an improper "donation" to a foreign government body to curry favor to obtain land lease agreements. The alleged acts of wrongdoing are in violation of relevant laws, rules, and regulations, and have subjected (and continue to subject) Wynn to significant and unreasonable risks and harm without any commensurate or appropriate reward to the Company. Causing the Company to engage in the improper tactics that threaten its survival is not a protected business decision and such conduct can in no way be considered a valid exercise of business judgment. Consequently, defendants S. Wynn, Schorr, Chen, Zeman, Miller, Shoemaker, Wayson, Goldsmith, Moran, E. Wynn, and Irani face a substantial risk of liability for breach of good faith and loyalty, rendering them unable to fairly and objectively evaluate a pre-suit demand. Thus, demand on the Board is futile, and therefore, excused.

/ / /

/ / /

**Demand Is Excused Because Defendants S. Wynn, Schorr, Chen, Zeman, Miller, Shoemaker, Wayson, Goldsmith, Moran, E. Wynn, and Irani Face a Substantial Likelihood of Liability for Their Misconduct**

93.     As particularized herein, to properly prosecute this lawsuit, Wynn's directors would have to sue themselves and the other defendants, requiring them to expose themselves and their comrades to tens of millions of dollars in civil liability and/or sanctions. This they will not do. A majority of the Board, indeed, all of them except Okada, are exposed to potential liability for operating Wynn outside of the law and approving the improper payment to the University of Macau Development Foundation. Thus, demand on the Board is futile, and therefore, excused.

94.     The Wynn Board and its top executives participated in, approved, and/or permitted the wrongs alleged herein to have occurred and/or recklessly disregarded the wrongs complained of herein, and are therefore not disinterested parties. As a result of their access to and review of internal corporate documents, conversations, and connections with other corporate officers, employees, and directors, and attendance at management and/or Board meetings, each of the defendants knew the adverse, non-public information regarding the improper payments under investigation by the SEC. Defendants breached the fiduciary duties that they owed to Wynn in conducting Wynn's business in Macau without preventing and affirmatively approving the improper payment. Thus, demand on the Board is futile, and therefore, excused.

95.     The members of Wynn's Board have benefited, and will continue to benefit, from the wrongdoing herein alleged and have engaged in such conduct to preserve their positions of control and the perquisites derived thereof, and are incapable of exercising independent objective judgment in deciding whether to bring this action.   Defendants, through their course of conduct to date, have demonstrated their unwillingness to seek appropriate relief for the overpayment of this compensation once the risk is accounted for and the penalties and costs are reconciled into Wynn's balance sheet. Thus, demand on the Board is futile, and therefore, excused.

96.     Under the Company's Code, defendants S. Wynn, Schorr, Chen, Zeman, Miller, Shoemaker, Wayson, Goldsmith, Moran, E. Wynn, and Irani, owed specific duties to go above and beyond their fiduciary duties imposed by law.  Indeed, the Code is "to reinforce and enhance the Company's commitment to an ethical way of doing business."  The Code also has specific provisions related to bribery under the FCPA.  Thus, defendants S. Wynn, Schorr, Chen, Zeman, Miller, Shoemaker, Wayson, Goldsmith, Moran, E. Wynn, and Irani were responsible for complying with the Code, but failed to do so.  Despite their knowledge, or reckless disregard, defendants S. Wynn, Schorr, Chen, Zeman, Miller, Shoemaker, Wayson, Goldsmith, Moran, E. Wynn, and Irani caused the improper payment to the University of Macau Development Foundation.  Accordingly, defendants S. Wynn, Schorr, Chen, Zeman, Miller, Shoemaker, Wayson, Goldsmith, Moran, E. Wynn, and Irani breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein.  Thus, defendants S. Wynn, Schorr, Chen, Zeman, Miller, Shoemaker, Wayson, Goldsmith, Moran, E. Wynn, and Irani face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

97.     Defendants Goldsmith, Shoemaker, Wayson, and Zeman, as members of the Audit Committee, reviewed and approved the Company's compliance program with respect to legal and regulatory compliance and the Company's policies and procedures for monitoring compliance.  The Audit Committee's Charter provides that it is responsible for compliance with accounting, legal, and regulatory requirements.  Further, the Audit Committee Charter states the Audit Committee is to "[r]eview with the [Company's] legal advisers legal matters that may have a material effect on financial statements, the [Company's] compliance policies and any material reports or inquiries received from regulators or governmental agencies relating to any matter that

may have a material effect on the [Company's] financial statements."  Thus, the Audit Committee Defendants were responsible for knowingly or recklessly allowing the improper donation.  Despite their knowledge, or reckless disregard, the Audit Committee Defendants caused these improper statements.  Accordingly, the Audit Committee Defendants breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein.  Thus, the Audit Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

98.     Defendants Miller and Schorr and non-defendant Strzemp, as members of the Gaming Compliance Committee, assisted the Company in maintaining the highest level of regulatory compliance.  Moreover, the Gaming Compliance Committee is not an independent committee of the Board.  Thus, the Gaming Compliance Committee Defendants were responsible for knowingly or recklessly allowing the improper donation and failing to comply with regulatory requirements.  Accordingly, the Gaming Compliance Committee Defendants breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein.  Thus, the Gaming Compliance Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties, so any demand upon them is futile.

99.     As detailed above, defendants S. Wynn, Schorr, and Chen are incapable of impartially considering a demand to commence and vigorously prosecute this action because they have an interest in maintaining their principal occupation and the substantial compensation they receive in connection with that occupation.

100.     Moreover, the acts complained of constitute violations of the fiduciary duties owed by Wynn's officers and directors; and these acts are incapable of ratification.

101.   Each of the defendant directors of Wynn authorized and/or permitted the improper payments to the University of Macau Development Foundation, and are principal beneficiaries of the wrongdoing alleged herein and, thus, could not fairly and fully prosecute such a suit even if such suit was instituted by them.

102.   Wynn has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Wynn any part of the damages Wynn suffered and will suffer thereby. Instead, they are trying to oust a director who went against the grain and tried to prevent the improper payment to the University of Macau Development Foundation.  Now, no director will dare go against defendant S. Wynn or question his actions after seeing his response to Okada's questioning of the donation to the University of Macau Development Foundation.

103.   The Board's response to Okada's Petition to inspect Wynn's books and records also demonstrates the futility of demand.  An inspection demand is a longstanding right of shareholders in the companies they own stock in.  Directors also have this right.  Okada is a director and shareholder.  In response to the Petition, defendant S. Wynn and the rest of the Board other than Okada caused Wynn to deny the inspection demand that a Nevada court later ruled had merit and permitted the inspection of the documents demanded.  In response to the Petition, the rest of the Board also embarked on a plan to discredit Okada and make counter-accusations to deal with his very serious allegations against the Board. Thus, any demand on the Board would be met with similar contempt and be a futile and useless act.

104.   If Wynn's current and past officers and directors are protected against personal liability for their acts of mismanagement and breach of fiduciary duty alleged in this Complaint

by directors and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, i.e., monies belonging to the stockholders of Wynn. However, the directors' and officers' liability cases contain provisions that eliminate coverage for any action brought directly by Wynn against these defendants, known as the "insured versus insured exclusion." As a result, if these directors' insurance policies covering the defendants in this were to cause Wynn to sue themselves or certain of the officers of Wynn, there would be no directors and officers' insurance protection and, thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. If there is no directors and officers' liability insurance, then the current directors will not cause Wynn to sue the defendants named herein, since they will face a large uninsured liability and lose the ability to recover for the Company from the insurance.

105.  Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek to recover for Wynn for any of the wrongdoing alleged by plaintiff herein.

106.  Plaintiff has not made any demand on the other shareholders of Wynn to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)  Wynn is a publicly held company with over 100.5 million shares outstanding and thousands of shareholders;

(b)  making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of shareholders; and

(c)     making demand on all shareholders would force plaintiff to incur excessive expenses, assuming all shareholders could be individually identified.

## FIRST CAUSE OF ACTION
### (Against the Individual Defendants for Breach of Fiduciary Duty)

107.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

108.    The Individual Defendants owed and owe Wynn fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Wynn the highest obligation of good faith, fair dealing, loyalty, and due care.

109.    The Individual Defendants and each of them, violated and breached their fiduciary duties of candor, good faith, and loyalty. More specifically, the Individual Defendants violated their duty of good faith by creating a culture of lawlessness within Wynn, and/or consciously failing to prevent the Company from engaging in the unlawful acts complained of herein.

110.    The Individual Defendants, as directors of the Company, owed Wynn the highest duty of loyalty. Defendants S. Wynn, Schorr, and Chen, as officers of Wynn, or Wynn Macau owed the Company fiduciary duties of care and loyalty. The Individual Defendants breached their duty of loyalty by knowingly or recklessly allowing the Company to violate the FCPA and failing to conduct its business and operations without establishing and maintaining internal controls and accounting systems for compliance with the FCPA.

111.    The Audit Committee Defendants failed to ensure the Company complied with the requisite laws, rules, and regulations and failed to set up internal controls to do so. This constituted a violation of the duties of the members of the Audit Committee under its respective

charter. Thus, the Audit Committee Defendants completely and utterly failed in their duty of oversight.

112. The Gaming Compliance Committee Defendants failed to ensure the Company complied with the requisite laws, rules, and regulations and failed to set up internal controls to do so. This constituted a violation of the duties of the members of the Gaming Compliance Committee. Thus, the Gaming Compliance Committee Defendants completely and utterly failed in their duty of oversight.

113. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Wynn has sustained significant damages, as alleged herein. As a result of the misconduct alleged herein, these defendants are liable to the Company.

114. Plaintiff, on behalf of Wynn, has no adequate remedy at law.

## SECOND CAUSE OF ACTION
### (Against the Individual Defendants for Waste of Corporate Assets)

115. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

116. As a result of the improper donation to the University of Macau Development Foundation, the Individual Defendants caused the Company to waste corporate assets by: (i) providing monetary benefits to a foreign entity; (ii) by incurring at least tens of millions of dollars of legal liability and/or legal costs to defend defendants' unlawful action; (iii) by failing to properly consider the interests of the Company and its public shareholders; (iv) by failing to conduct proper supervision; and (v) using Company assets to support S. Wynn's personal battle with Okada.

117. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

118.    Plaintiff, on behalf of Wynn, has no adequate remedy at law.

### THIRD CAUSE OF ACTION
**(Against the Individual Defendants for Unjust Enrichment)**

119.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

120.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Wynn.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Wynn.

121.    Plaintiff, as a shareholder and representative of Wynn, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

122.    Plaintiff, on behalf of Wynn, has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Wynn, demands judgment as follows:

A.      Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.      Directing Wynn to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Wynn and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote of the following Corporate Governance Policies:

1                1.     a proposal to strengthen the Company's FCPA controls;

2                2.     a proposal to conduct annual training on FCPA compliance for the Board

3  and the Company's executives;

4                3.     a proposal to strengthen the Board's supervision of operations and

5  develop and implement procedures for greater shareholder input into the policies and guidelines

6  of the Board; and

7

8                4.     a provision to permit the shareholders of Wynn to nominate at least three

9  candidates for election to the Board;

10      C.     Extraordinary equitable and/or injunctive relief as permitted by law, equity, and

11  state statutory provisions sued hereunder, including attaching, impounding, imposing a

12  constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or

13  their other assets so as to assure that plaintiff on behalf of Wynn has an effective remedy;

14      D.     Awarding to plaintiff the costs and disbursements of the action, including

15  reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

16

17      E.     Granting such other and further relief as the Court deems just and proper.

18  / / /

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: April 4th, 2012.

RESMAN SOROKAC

Joshua H. Reisman, Esq.
Nevada Bar No. 7152
Robert R. Warns III, Esq.
Nevada Bar No. 12123
8965 South Eastern Avenue, Suite 382
Las Vegas, NV 89123

Attorneys for Plaintiff

ROBBINS UMEDA LLP
Brian J. Robbins
Felipe J. Arroyo
Shane P. Sanders
Gina Stassi
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsumeda.com
farroyo@robbinsumeda.com
ssanders@robbinsumeda.com
gstassi@robbinsumeda.com                    To be admitted Pro Hac Vice

THE WARNER LAW FIRM
PAUL T. WARNER
11123 McCracken Circle, Suite A
Cypress, TX 77429
Telephone: (281) 664-7777
Facsimile: (281) 664-7774
E-mail: pwarner@warner-law.net              To be admitted Pro Hac Vice

STEPHEN J. O'BRIEN & ASSOCIATES
STEPHEN J. O'BRIEN
650 Ridge Road, Suite 400
Pittsburgh, PA 15205
Telephone: (412) 788-7560
Facsimile (412) 788-7563
E-mail: sjobrien@sobrienlaw.com             To be admitted Pro Hac Vice

Attorneys for Plaintiff

- 44 -

<u>VERIFICATION</u>

I, Sye Kelly, hereby declare as follows:

I, Sye Kelly, on behalf of Boilermakers Lodge No. 154 Retirement Fund, have read the Verified Shareholder Derivative Complaint for Breach of Fiduciary Duties, Waste of Corporate Assets, and Unjust Enrichment. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: ___4/3/2012___

_____
SYE KELLY, TRUSTEE